## In re Assigned Estate of the Order of Tonti. Appeal of Harry F. F. Bordley et al.

*Beneficial associations—Insolvency—Matured and unmatured certificates.*
Where a beneficial association is insolvent at the time that it makes an
assignment for the benefit of creditors, and owing to the impracticable plan
upon which it was founded was never solvent at any time, the holders
of certificates which had matured at the time of the assignment are not enti-
tled to preference in the distribution of the assigned estate over the hold-
ers of unmatured certificates.

Argued Jan. 23, 1896. Appeal, No. 137, July T., 1895, by
Harry F. F. Bordley et al., from order of C. P. No. 1, Phila. Co.,
March T.,1894, No.     , dismissing exceptions to auditor's re-
port. Before STERRETT, C. J., GREEN, WILLIAMS, McCOLLUM,
MITCHELL, DEAN and FELL, JJ. Affirmed.

Exceptions to auditor's report, distributing the funds of the
assigned estate of the Order of Tonti.

The account was referred to Charles A. Mann, Esq., as au-
ditor, who reported in part as follows :

The " Order of Tonti " was chartered on April 25, 1885, by
the court of common pleas No. 1 of Philadelphia county, the
charter setting forth :

"Section II. The purposes of said corporation shall be the
maintenance of a society for beneficial or protective purposes to
its members from funds collected therein.". . . .

In the constitution of the supreme lodge of the order as it
existed on the 18th day of May, 1894, the date of the deed of
assignment to the accountants, as hereinafter set forth, the
objects of the order are stated to be :

1. To unite in the bonds of faith, firmness and fraternity all
acceptable white persons between the ages of eighteen and sixty
years, of good moral character, steady habits, sound bodily
health, reputable calling, and who believe in a Supreme Being.

2. To improve the condition of its membership morally and
socially, and to provide for the comfort of the sick and dis-
tressed members of the society by instructive lessons, judicious
counsel and timely aid.

"3. To establish a relief fund, from which members of this organization who have complied with all its laws, rules and regulations may receive:

"I. The benefit of a sum not exceeding $25.00 per week, when, by reason of disease or accident a member becomes disabled from following his or her usual occupation, or not exceeding one half of the amount of the certificate held by any member, when, by reason of disease or accident, he or she becomes disabled from following his or her usual or some other occupation; or,

"II. An amount not exceeding $1,000 when a member has held a continuous membership in the order for seven years; *Provided*, however, that the sum total drawn from this order by any of its members shall never exceed, both in sick, disability or other benefits, the sum named in the certificate of membership."

By the general laws of the supreme lodge, there was established a relief fund, from which each member was entitled to receive matured or sick benefits in proportion to the amount of assessment paid in conformity with the laws of the order. . . .

The benefit fund was raised by assessments levied upon the members of the order by authority of the supreme executive committee, to whom was delegated the power of levying and calling assessments for the purposes of the order, as the committee might deem necessary.   Law 1, section 2, is as follows: "Each member shall pay to the secretary upon notice the amount prescribed in the foregoing table on account of the relief fund, and the same amount on cash assessments thereafter while his or her certificate remains in force."

The expenses of maintaining the organization were paid by a per capita tax on the membership and from the profits on the sale of regalia, stationery, etc.   The assessments were appropriated exclusively for the benefit of the members in payment of sick benefits and of matured certificates.   Thirty per centum of each assessment was set apart for a reserve fund, under the provisions of law 2, section 1, of the general laws.

Under law 4 of the general laws of the order, the supreme lodge instituted subordinate lodges, and it was in the subordinate lodges that the members of the order were gathered together, and the social side was an important feature.   The

subordinate lodges participated in the election of the supreme lodge which was held every two years.   The supreme lodge was the governing body of the order, and by article 3, section 1, of the constitution of the supreme lodge it is provided as follows : · "The Supreme Lodge shall meet biennially on the fourth Monday in April, at two o'clock p. m., at such place as may be agreed upon at each preceding regular meeting.   Previous to all meetings notice of the time and place thereof shall be given by the Supreme Secretary to all who are eligible to membership in the Supreme Lodge.   The Supreme Lodge may adjourn from day to day until the business of the session is disposed of.   Provided that should any session exceed four days the officers and representatives shall have pay for four days only."

Between the sessions of the supreme lodge the affairs of the order were managed, directed and controlled by a supreme executive committee, which was authorized to exercise all the powers of the supreme lodge.

The general scope of the order was the maintenance of what is popularly known as a secret, fraternal beneficial society, having for its object the collection of funds from its members by periodical. assessments, the investment of the same and the accumulation and the collection of the interest from these investments ; and out of the assessments and the accumulations of income, at the expiration of seven years from the date of each certificate of membership, repay to its members a sum not exceeding an amount limited in the certificate of membership ; subject, however, to the right of the member, in the event of illness, to receive a certain weekly sum in proportion to the amount named in the certificate of membership ; in which event the amount advanced on account of sick benefits was to be charged with interest against the amount payable on the maturity of the certificates.   At the organization of the order it was supposed that this result could be accomplished by a moderate number of assessments, but, recognizing that the scheme was an experiment, it was carefully provided that the number of assessments to be levied should be in the discretion of the supreme executive committee, and that but one eighty-fourth of the reserve fund should be called in any one month to the aid of the relief fund for the payment of certificates maturing in that month.   In this connection it is to be observed that one

eighty-fourth for each month represents the proportionate part of the eighty-four months that have elapsed from the date of the certificate until its maturity, seven years being the same as eighty-four months.   And it was further provided that "when the amount received for one assessment, less the reserve fund, shall equal an amount less than $1,000, the sum to be paid shall in no case exceed the amount of one assessment less the reserve fund, and the said amount shall be all that can be claimed by any one."

These provisions render intelligible what is meant by the expression in the certificate of membership, which provides for the payment to a member of a sum "not exceeding" the amount named, which will be further referred to hereafter in connection with the question of distribution.

Immediately after the incorporation in April, 1885, the order was organized and subordinate lodges established.   The number of assessments levied and collected in each year since the organization of the order was as follows:

For the year ending April 27th, 1886,  7 assessments
  "      "      "      "      "     1887, 11 assessments
  "      "      "      "      "     1888, 12 assessments
  "      "      "      "      "     1889, 14 assessments
  "      "      "      "      "     1890, 16 assessments
  "      "      "      "      "     1891, 16 assessments
  "      "      "      "      "     1892, 17 assessments
  "      "      "      "      "     1893, 20 assessments
  "      "      "      "      "     1894, 31 assessments
                                         ———
                                         144

April 28, 1894, to May 18, 1894.

144 assessment was called April 21, 1894, not collected; 145 and 146 assessments were called April 30 and May 10, 1894, not collected.

From the time of the organization of the order down to the date of its assignment on May 18, 1894, to The Land Title and Trust Company and Francis Shunk Brown, the accountants, it received from its members the sum of $4,464,539.09, and it repaid to its members on account of sick and disability benefits and matured certificates the sum of $3,489,872.85.   The order at the date of the assignment comprised a membership of over

15,000 members, who were connected with 399 lodges, which were organized and in operation in the states of Pennsylvania, New York and elsewhere; that of this membership 712 members held matured certificates, aggregating the nominal amount of $655,000, upon which they had paid into the order as assessments about the sum of $201,631.50, and had been repaid under the sick benefit clauses various sums, which, with interest, calculated down to the day of the assignment, aggregated the sum of $64,215.14.

By a "matured certificate" of membership is meant a certificate upon which seven years had expired from its date, and the member had paid all assessments and dues levied against him; and by "unmatured certificate" is meant a certificate of membership upon which seven years had not elapsed from its respective date, but the member had paid all assessments levied against him which were due and payable at the time of the assignment. The unmatured certificate holders at the date of the assignment numbered upwards of 14,400, and they held certificates aggregating about $13,100,000, upon which they had paid into the order approximately $2,880,724.50, and had received sick benefits which with interest calculated to the date of the assignment, aggregated the sum of $791,056. The assets of the Order of Tonti, as appears from the books thereof on the said 18th day of May, 1894, amounted to the sum of $1,160,400.46. The assets of the order so transferred as aforesaid to the accountants were appraised by appraisers appointed by the court in this proceeding at the sum of $1,007,880.27.

In the spring of 1894 the large number of certificates maturing warned the management of the order that the funds in their possession would be insufficient to meet the very large amount of rapidly maturing certificates. The general sentiment of the order was favorable to its continuance, provided a scheme could be devised that would place it upon a substantial basis, which would render it a financial success. It was believed that by reducing the obligations of the order by what was substantially one half, this result could be accomplished. Accordingly, at a special meeting of the supreme executive committee, held May 3, 1894, it was resolved to levy two hundred and ten debit assessments.

In accordance with this resolution two hundred and ten debit

assessments were levied to take effect on the 3d day of May, 1894. This was no sooner done than it developed such an opposition in the order, particularly from that class of membership whose certificates would shortly have matured, which satisfied the supreme executive committee that the plan proposed could not be successfully carried out.   Proceedings looking to the appointment of a receiver had already been commenced by certain certificate holders.

It was thereupon decided that the true interests of the order would·be best served by making an assignment for the benefit of the creditors and thereafter the winding up of the business and a distribution of the assets among the members.   Accordingly the assignment was made, dated the 18th day of May, 1894, to The Land Title and Trust Company of Philadelphia, and Francis Shunk Brown, who, on the day of its date, accepted the trust contained therein, . . . .

The assignees filed their first account of the trust estate on the 27th day of August, 1894, which was referred by your honorable court to your auditor, to audit, settle, adjust, and report distribution of the balance in the hands of the accountants. Pending the audit the assignees have converted into cash additional assets, and on March 13, 1895, filed a second account which has been referred by your honorable court to your auditor, in order that these additional funds may be included in this distribution.

These accounts were duly vouched by the auditor and found correct.

The order had comparatively few creditors, all of whom have been paid in full by the accountants, and these payments the auditor approves.   They consisted principally of salaries, wages, advertising bills and stationery.

The claims, as presented by the certificate holders, may be divided into five classes, as follows :

First. Those who hold certificates upon which all dues and assessments have been paid for a period of seven years.   This class will be designated matured certificate holders.

Second. Those holding certificates upon which all dues and assessments have been paid, but which have not run a period of seven years.  These will be designated unmatured certificate holders.

Third. Warrants drawn and delivered for sick benefits, but not presented for payment before the assignment. These will be designated sick benefit warrants.

Fourth. Claims for sick benefits approved by the supreme medical examiner, but no warrants drawn. These will be designated sick benefit claims.

Fifth. Claims of members for reimbursements who have paid assessments subsequent to No. 143. These will be designated assessment claims.

These respective claims will be considered in their order, but in the view the auditor takes of the questions there is no substantial difference between any of them, as they are all to be determined by their rights as members of the order at the date of the assignment, and as such an equitable distribution of the fund is to be made between them.

First. Matured certificate holders.

Second. Unmatured certificate holders.

On admission to the order the member received a certificate substantially as follows :

"Whereas                     has been admitted to membership in                     Lodge, No.        , Order of Tonti, and has promised to obey all lawful commands of this order, whether emanating from a subordinate lodge or from this Supreme Lodge or from any other duly constituted authority, and in consideration of the sum of        , which has been paid to said subordinate lodge, as an assessment on account of the relief fund of this order and of further assessments of a like amount to be paid as may be lawfully called for, and of an explicit compliance with all the laws, rules and usages of this order and especially with the conditions herein set forth, the Supreme Lodge, Order of Tonti, hereby grants unto the said member this certificate and declares the said member to be entitled to all the rights and privileges belonging to a member of the order, including a benefit of not exceeding                     Dollars from the relief fund of the order, which sum shall be paid in the manner prescribed in the laws of the order, and upon the following conditions, to wit:

"First. In case the said member shall become temporarily totally disabled from following his or her usual occupation, by

disease or accident, which shall not have been produced or brought about by his or her own vicious or immoral conduct, during the continuance of this certificate, all assessments, dues and demands being at the time fully paid, and being in all respects in good standing in the order, the membership having been of not less than sixty days' duration, then he or she shall be entitled to a benefit for each week's disability in a sum not exceeding two and one-half per cent. of the principal amount named herein for not exceeding twenty weeks, which benefit shall be paid when the member has entirely recovered, or when he or she has been disabled for one or more weeks, in weekly installments of one or more weeks, as the member shall elect.

" Second. In case the said member shall become totally and permanently disabled from following his or her usual or some other occupation, by a cause not resulting from his or her own vicious or immoral conduct during the continuance of this certificate, all assessments, dues and demands being at the time paid, and he or she being in good standing in the order, then he or she shall be entitled to a sum not exceeding one-half the principal amount named herein, less the amount which has already been received from the order, with six per cent. interest.

" Third. In case of the death of said member, all assessments, dues and demands against him or her or against the certificate being at the time paid and the member being in good standing in the order, his or her legal heirs may at their option either continue the certificate by paying the amount in the same manner which the member would have had to pay had he or she lived, and at the end of the term receive the amount to which the member would have been entitled, or may demand and receive from the order all assessments which the deceased had paid on account of the relief fund, less the amount which had already been received as benefits from the order, with interest to date of death. The said heirs in order to receive the benefits of this provision must make their election in writing within thirty days of the date of the death of the member, otherwise this certificate shall become forfeited, together with all rights and privileges secured thereby.

" Fourth. In case the said member shall continue to pay all assessments, dues and demands which may be legally made against him or her or against this certificate for the full term

of seven years from its date, and shall, in all particulars, maintain themselves in good standing in the order, then the said member shall be entitled to a sum not exceeding the principal amount named herein, less the amount which has already been received as benefits from the order on account of sickness or other disability, or otherwise, with accumulated interest from date of said payment to date of expiration of certificate.

" Fifth. It is expressly understood and agreed that this certificate and the contract with the order under its laws are subject to such changes by the Supreme Lodge as may from time to time be made by it, and that the said member in accepting this certificate agrees to be bound by the terms of this certificate and the laws of the order as they now exist, or if the terms hereof or the laws of the order be changed by the Supreme Lodge in any way, then to be bound by such changes as though they had been incorporated herein.

" It is fully understood and agreed that no notice of regular dues is necessary or required, but that it is the duty of the member to pay the same when due without notice.   It is further agreed that the mailing of notices of assessments to the last known residence or address of the member, ten days prior to the expiration of the time named therein, within which the payment called for thereby should be made, or the personal delivery of such notices three days prior to said expiration of time, shall be full and legal serving of the same, and when so mailed or delivered all responsibilities of the order or any lodge or officer thereof shall finally cease and determine." . . .

Those holding matured certificates claimed from the fact of their certificates having run for a period of seven years from the date thereof, and all dues and assessments having been fully paid for that period of time, that as to the amount limited therein, they were entitled to receive the full amount thereof upon two grounds :

First. Because the matured certificate holder upon maturity of his certificate ceased to be a member and became a creditor of the order ; and,

Second. Even if he did not, the defaulting members who had failed to pay all assessments levied against them, including the two hundred and ten debit assessments, are not entitled to par-

ticipate in the distribution until they pay their assessments, and cannot take advantage of the insolvency of the order, if it exist, created by their own default.

The unmatured certificate holders claimed that inasmuch as an assignment had been made, the order stood upon the basis of an insolvent corporation, the assets of which were owned by all the members per my et per tout, and were to be divided among them in proportion to the amounts paid in by them regardless of the fact that by the terms of the certificate the matured certificate holders had complied with the terms thereof, and were apparently entitled to a sum not exceeding the amount limited in their certificates.

When the assignment to the accountants by the Order of Tonti was delivered and recorded, the order was insolvent; in fact, there was no time in the existence of the order when, in view of its obligations, it was solvent. The scheme was impracticable; it was not capable of accomplishment; that is, the number of assessments requisite to pay the amount of the certificates as they matured could not be collected from the membership within the seven years limited for payment; at least the rate at which the assessments were levied at no time was sufficient for this purpose. The auditor does not, in so reporting, intend to cast the least reflection upon the good faith of the management of the order. On the contrary, he is satisfied that the management acted in the fullest of good faith in their dealings with the order. The compensation of the officers and the expenses were paid entirely from the funds contributed expressly for those purposes, and no part of the assessments for the relief fund was so used. As heretofore stated, the relief fund was appropriated entirely for the benefit of the certificate holders. The management honestly endeavored to make the scheme a success. The trouble with it was that it was incapable of success; they undertook to pay more than the money which they received would justify, and it was only a question of time when the obligations would swamp the accumulated assets. The order paid all matured certificates that had matured prior to the 18th day of March, 1894, with the exception of two certificates, the payment of which had been delayed on account of defective proofs. The assets of the order, as shown by its books, on the 20th day of March, 1894, were $1,350,855.69;

the outstanding, unmatured certificates aggregated $14,477,200. Therefore, on the 20th day of March, 1894, the order was insolvent and incapable of meeting its obligations, having in view the obligations that thereafter were to mature. So that at the time of the maturity of the respective maturing obligations as aforesaid, the auditor finds as a fact, that the Order of Tonti was insolvent. Under the provisions of the by-laws, the obligations maturing after March 20, 1894, did not become absolutely payable until the day of and after the assignment to the accountants. Therefore, at the time the certificates matured and at the time, under the by-laws, payment of the same was demandable, the order could not have paid the same with any possibility of leaving funds in the order that would pay subsequently maturing certificates in the same manner and to the same extent. According to the books of the order there was less than $1,200,000 in the relief and reserve funds, and there was over $600,000 of certificates which had matured, and within a few months the rapidly maturing certificates would have exhausted the entire assets of the corporation. As before stated herein, the purpose of the order had failed of accomplishment. It had undertaken to do that which was not practically capable of accomplishment within the time limited for the maturing of the certificates. In the first years of its organization the assessments had been about one a month, but as the obligations matured the management was compelled to increase the number of assessments so that in the last year the number levied and collected was sometimes three a month. While it is true that the management of the order had a right to levy an unlimited number of assessments, yet that number was actually limited by the amount which could be collected. As a practical question when they reached, as they did reach, three assessments a month, they had reached the limits of endurance and performance of the membership. By the terms of the certificate the time for payment was limited to seven years. There was only one course left open which held out any hopes of maintaining the order, and that was to do what they actually did, levy at one time two hundred and ten assessments on all certificates which had been issued prior to the 23d day of August, 1893. This meant on a thousand dollar certificate, $525 of assessments levied at one time and a proportionate amount on all certificates

for a less amount. Of course, this could not be collected, and they did the next best thing, they authorized its being charged against the certificates, thereby reducing the liability on the certificate by the amount of the two hundred and ten assessments, but, as heretofore stated, the result of levying these debit assessments, as they were called, produced so much opposition from the older certificate holders that the winding up of the order was the only just course left open.

In the opinion of the auditor, the winding up of a corporation of this character must be on the same lines as if the organization had been an unincorporated association with the same object, purposes, rules and agreements as those governing the incorporated body.

The Order of Tonti, under the laws governing its existence, is in fact and in law a partnership, with corporate rights, in which every certificate holder is a member, and entitled to participate in the distribution of the assets thereof, according to the equitable rule that determines the amount of the interest in the fund in accordance with the amount of the contribution thereto, consideration being had to the constitution and laws of the order and the certificate of membership.

Judge LUDLOW, in delivering the opinion in the Assigned Estate of the National Savings, Loan and Building Association, 9 W. N. C. 79, says: "A building association has but few creditors, strictly so called; the organization is in fact and in law a partnership with corporate rights, in which every stockholder is a member; and while it may be true that a stockholder may recover a judgment against the corporation, and thus . . . . become in a sense a creditor, yet the peculiar nature of the constitution and by-laws of a building association, clearly, we think, indicates that an assignment for the benefit of creditors, under our law, was never intended to reach such creditors as the members of building associations must be who have even obtained judgment upon their claims."

This language was cited with approval by the present Chief Justice in Christian's App., 102 Pa. 184.

This last-mentioned case is very much in point. In it the representatives of certain of the stockholders in a building association, whose funds were for distribution, and who were holders of orders on the treasury issued to them as withdrawing

stockholders more than six months before the assignment, contended that they having terminated their relations to the association, and the amount due them on such termination having been ascertained, and an order drawn for its payment, had ceased to be members of the association, and were, therefore, entitled to be preferred over the stockholders who had remained in the association. The auditor awarded the balance of the fund pro rata to this class of stockholders to the exclusion of the remaining stockholders. His report being confirmed by the common pleas, it was, on appeal, reversed by the Supreme Court, who held that there was no preference to be allowed between the stockholders.

The present Chief Justice, delivering the opinion, says (page 188) : " The principal ground of complaint is that after satisfying the treasurer's claim, the residue of the fund was distributed pro rata among claimants of the second to the exclusion of the third class. That result was reached by holding that members of the association who had given the requisite notice of withdrawal thereby ceased to be stockholders and became creditors to the extent of the withdrawal value of their stock, as evidenced either by orders on the treasurer or by the books of the association, and consequently their claims are superior to those of their fellow stockholders who had not given the requisite notice of withdrawal. In this we think there was manifest error. While, in a qualified sense, withdrawing stockholders may be considered creditors of the association, their rights, as against those with whom they have been associated, are very different from those of general creditors whose claims are based wholly on outside transactions. If the association had been prosperous, they have a right, under certain limitations and restrictions, to demand and receive their proportionate share of the accumulated fund, but if bad investments have been made, or losses have been sustained before actual withdrawal, they must bear their just proportion thereof. That right, as was held in United States Building and Loan Association v. Silverman, 4 Norris, 394, may be enforced by appropriate proceedings at law. But the right of withdrawal and the extent to which it may be exercised presupposes that at least a relative proportion of the assets will remain for the benefit of those who continue to be active members of the association.

" When a building association has failed to fulfill the objects of its creation, and has become hopelessly insolvent, it cannot be justly or equitably wound up upon any other principle than that above suggested.    After expenses incident to the administration of its assets are deducted, the general creditors, if any, should be first paid in full, and the residue of the fund should be distributed pro rata, among those whose claims are based upon the stock of the association, whether they have withdrawn and hold orders for the withdrawal value thereof, or not.    Both classes are equally meritorious, and in marshaling the assets neither is entitled to priority over the other.    The claims of each are alike based upon their relation to the association as members thereof.    Orders issued to withdrawing stockholders are merely evidence of their interest in the assets remaining after paying general creditors.    As was well said by the learned president of the common pleas in the Assigned Estate of National Savings, Loan and Building Association, 9 W. N. C. 79, such an organization is, in fact and in law, a partnership, with corporate rights, in which every stockholder is a member ; and while it may be true that a stockholder may recover judgment against the corporation and thus become in a certain sense a creditor thereof, he is nevertheless not a creditor within the meaning of our assignment laws.    There is also great force in his suggestion that the appropriate method of administering the assets, remaining after payment of general creditors, would be through a receiver.    While such a course would be strictly regular, the same result may be more directly and equally as well attained by the course pursued in this case."

In Callahan's Appeal, 124 Pa. 138, a building association had caused a mortgage, made by a member of it, to be satisfied, on the ground that the shares had matured.    It was subsequently discovered that the shares had not so matured, and the court set aside the entry of satisfaction, and allowed a recovery to be had on this mortgage.    Chief Justice PAXSON said (page 144) : " The appellant was entitled to have his mortgage satisfied whenever the stock had matured ; that is, whenever it was worth $200 per share."

In the present instance the certificate holder is entitled to receive full payment of his matured certificate when and only when the assets of the order are sufficient to entitle it to be

paid to him and leave a sufficient fund, that those who come
after him are reasonably likely or probable to receive a similar
amount. It is manifest that such payment could not be made
to the matured certificate holders with any possibility of paying
the unmatured certificate holders a similar amount. The as-
sets in round numbers are $1,000,000; the matured certificates,
$655,000; the unmatured certificates are over $13,000,000.
The matured certificates have paid into the order $201,631.50,
and the unmatured certificates $2,880,724.50. Under such cir-
cumstances it would be inequitable to pay the 712 members
whose certificates had matured over three times as much as
they had contributed to the assets of the order, and leave the
14,400 members to be repaid less than ten per centum of their
contribution to the funds of the order, which would be substan-
tially the result if the contention of the matured certificate
holders is to prevail.

The scope of the Order of Tonti has much in common with a
building association. A building association makes a monthly
assessment on its members, and whenever these assessments,
with their accumulation, amount to the sum of $200 the stock
is said to have matured, and the member is entitled to withdraw
the amount from the funds of the association.

The period when this withdrawal could be made was uncer-
tain. It was dependent upon the accumulation of the amount
of money necessary to enable it to be done. In the Order of
Tonti, on the other hand, the period at which the limited amount
was to be paid was fixed, but the number of assessments was
left uncertain. If, as a practical question, the requisite number
of assessments could be levied and collected, there would be no
difficulty in repaying the amount, but the order started out and
for a number of years continued to collect an insufficient num-
ber of assessments, and the result was that it failed to fulfill
the object of its creation, and became hopelessly insolvent.
The parallelism between the scope of a building association
and an association such as the Order of Tonti is quite obvious.
The main feature in which it differs from a building association
is the payment of sick benefits, and, after all, such sick benefits
were but anticipated payments on account of the principal of
the certificate, because, by the very terms of the certificate,
they were to be charged against the principal thereof, together

with interest thereon at the maturity of the certificate, and became, so far as the payment of the certificate at maturity was concerned, a very valuable asset in meeting obligations of the order.

It is further contended by matured certificate holders that the levy of the two hundred and ten debit assessments made on May 3, 1894, and the nonpayment thereof by the members remaining in the order puts those members in default, and that if they had complied with such assessment and paid the same into the order no insolvency would have taken place, and to permit them now to be placed on the same footing with the matured certificate holders is to allow them to take advantage of their own default. This proposition, the auditor thinks, is unsound.  A sufficient answer to this contention of the matured certificate holders may be found in the fact that the two hundred and ten assessments could either be paid in cash or credited on the certificate.  It certainly never was contemplated by any member on joining the order that he would be called upon in a single assessment to pay $525 on account of a thousand-dollar certificate or a like proportionate sum on certificates for less amounts.

If the past action of the management of the order was to be any guide as to the probable number of assessments which would be called in the future, then the levy of two hundred and ten assessments at one time was without precedent.  When the order was first established the assessments did not exceed one a month, and they were not increased until within the last few years, the last year being at the rate of about three a month; the previous year about two a month.  It is manifest that this attempt at levying two hundred and ten assessments at one time was the last struggle to try and keep the order on its feet. It was promulgated on the 3d of May, and the assignment followed on the 18th of May.  Cause and effect could hardly be more clearly shown.  There can be no doubt that the attempt to levy such a number of assessments at one time was unreasonable and without authority in law, and certainly in an organization of this character inequitable.  While the supreme executive committee was clothed with discretionary power for the purpose of levying assessments, and although this discretion was unlimited in words, the auditor thinks it must be construed as being limited by the reasonableness of the exercise of the dis-

cretion in the light of all the circumstances.    The fact that the
certificate holders were given the option of debiting these as-
sessments against their certificates is in and of itself a confession
that they were unreasonable.    The management knew that they
could not be collected, neither was it ever intended that they
should be collected.    It was simply an effort to reduce the lia-
bilities of the order by cutting the certificates in half.    The
auditor thinks that the whole scheme of debit assessment was
clearly irregular and illegal, and was but an abortive attempt to
keep the organization alive, and, therefore, it would be unrea-
sonable and inequitable to require the unmatured certificate
holders to submit to the enforcement of the same as against
their certificates and in the meantime permit all the assets of
the order to be distributed in payment to fellow-members of the
matured certificates and leave nothing for themselves.

The question thus far has been considered as to what are the
rights of the matured certificate holders as members of the
order, irrespective of the terms of the certificates of membership.
It is not to be overlooked, however, that the certificate itself
and the by-laws governing membership contain some material
provisions governing the rights of members.

The language of the certificate is, "The Supreme Lodge,
Order of Tonti, hereby grants unto the said member this certifi-
cate and declares said member to be entitled to all the rights and
privileges belonging to a member of the order, including a ben-
efit of not exceeding            dollars, from the relief fund
of the order."    This language is further controlled by the
seventeenth section of law I. of the general laws of the supreme
lodge, which is as follows : " When the amount received for
one assessment, less the reserve fund, shall equal an amount
less than one thousand dollars, the sum to be paid shall in
no case exceed the amount of one assessment less the reserve
fund, and the said amount shall be all that can be claimed by
any one."    By section 1 of law II. it is further provided, that
" only one-eighty-fourth of the reserve fund shall be called to
the relief fund of the order during any one month."    This
last-mentioned provision continued in force until the 23d day of
August, 1893, when law II., page 26, of the general laws of the
supreme lodge was amended to read as follows : " There shall
be connected with this order a reserve fund, the maximum

amount of which shall not exceed one million five hundred thousand dollars, and the minimum amount of which shall not be less than five hundred thousand dollars, consisting of such moneys as have been or may be placed therein, under the operation of the general laws of the supreme lodge, and all moneys thus set aside shall be promptly turned over to and converted by the supreme trustees into first mortgages or bonds of the following class, viz., United States bonds, the bonds of any state or municipal government, provided no investment in such bonds shall be made without the approval of the supreme executive committee.  The bonds shall be held in trust.  No money shall be deposited in or withdrawn from any of the depositories of this reserve fund, except upon the signature of the five supreme trustees : Provided, that no portion of the reserve fund shall be called to the relief fund without the authority of the supreme lodge or the supreme executive committee." This was adopted for the purpose of enabling the order to appropriate a larger portion of the reserve fund than otherwise could be done to the payment of maturing certificates.

Taking the language of the certificate, then, together with these by-laws, it would seem that the expression "not exceeding " in the by-laws and in the certificate was used for the purpose of limiting the right of the members whose certificates matured in any one month to the funds realized by one assessment, plus one eighty-fourth of the reserve fund ; that is, such matured certificates should take or receive their proportion of such assessment and reserve fund, but they were not to have a sum exceeding the amount named in the certificate, even if the one eighty-fourth of the reserve fund plus the one assessment amounted to more than that sum.  While this provision as to one eighty-fourth of the reserve fund being applied to the certificates maturing in any one month was not in force at the time of the assignment, its purpose, undoubtedly, while in force, was to limit the amount payable on any certificate, and to reserve a fund for the benefit of the subsequently maturing certificates ; and the aforesaid amendment of the by-laws, which was in force at the time of the assignment, by providing that the minimum of the reserve fund "shall not be less than five hundred thousand dollars," also had for its object the protection of the subsequently maturing certificates.

The certificate is not an absolute undertaking to pay the sum mentioned therein upon the expiration of seven years from its date. The words "not exceeding" are not meaningless, as the matured certificate holders contend. They were put into the certificate and by-laws for the purpose of limiting the obligation of the certificate and the amount to which the member at the time of the maturity of the certificate should be equitably entitled, in view of the then condition of the order. The scope of the order undoubtedly contemplated payment of the amount limited in the certificate, but that was always subject to the condition that the scope of the order would be accomplished. In view of the experimental nature of the order, it was quite prudent in the originators of the scheme to insert these words "not exceeding" for the purpose of limiting the right of the member to receive an equitable proportion of the assets of the order, if it should be demonstrated that the order should fail to accomplish its purpose.

On this point the language of the auditor, which was approved by the Supreme Court in the case of the Fraternal Guardians' Assigned Estate, 159 Pa. 594, is apparently conclusive. The auditor said: "What is meant by a sum not exceeding one eighth? Is this merely a maximum limit of the amount to be paid to the certificate holder? Can it be argued that a contract to pay any amount not exceeding a certain sum is a contract to pay that sum? The mere interrogation suggests its absurdity. It was intimated at the argument that a sum not exceeding $625 might mean five cents; true enough, it might; but in an uncertain matter like this the law in its wisdom would say that this meant a sum which could be reasonably paid with a due regard to all the circumstances of the case. Now, what would have been a reasonable sum to have paid the matured certificates in this instance? It appears by the appraisement that the assets of the order amounted to $810,000. On the day the assignment was made, there was nearly $600,000 due to matured certificate holders. In two months more, enough certificates would have matured to wipe out the entire benefit fund that it had taken nearly four years to accumulate. The payment of the maximum sum mentioned in the certificates would have plunged the order into bankruptcy. Is it at all in doubt whether, under such circumstances, a court of law or equity would compel the payment

of the maximum sum on the certificates? It may be said that the supreme executive committee had power to call an unlimited number of assessments, but the exercise of it would have been disastrous to the order. Under these circumstances, the auditor cannot see how it would be possible to award the matured certificate holders the maximum limit of their certificates."

The Supreme Court in disposing of the assignment of error, calling in question the accuracy of the above-quoted language of the auditor, says (page 602): "Twelve exceptions filed to said report were dismissed by the court and distribution decreed in accordance with the schedule submitted by the auditor. Dismissal of said exceptions, all of which are recited in the first twelve specifications, and refusal to award the funds in the hands of the assignees to the holders of matured certificates in preference to the holders of certificates which had not matured at the date of the assignment, constituted the subject of complaint in the several specifications of error. We have considered the question involved, and are of opinion that the findings of fact and conclusion of the learned auditor are substantially correct, and for reasons fully set forth in his report the decree should be affirmed. In view of the insolvency of the order, the distribution made by the court below is just and equitable." It would certainly be inequitable in a fraternal beneficial society where mutuality is the basis of the contract, that a member whose certificate matured the day before the assignment should receive the maximum amount named therein, and that the member whose certificate would have matured the day after the assignment should receive comparatively nothing. In this distribution of an insolvent society of this character the equitable maxim applies, "Equality is equity."

The auditor therefore reports that the matured certificate holders are not entitled to any preference over their fellow-members in the distribution of the assets of the insolvent order, but must participate in the distribution of the funds in proportion to their several contributions thereto.

Exceptions were filed that the auditor erred:

1. In holding that the Order of Tonti under the laws governing its existence is in fact and in law a partnership with corporate rights, in which every certificate holder is a member and entitled to participate in the distribution of the assets thereof

according to the equitable rule that determines the amount of the contribution thereto, consideration being had to the constitution and laws of the order, and the certificate of membership. [1]

2. In holding that the matured certificate holders are not entitled to a preference over the holders of unmatured certificates in the distribution of the assets of the order, but must participate in the distribution of the funds in proportion to their several contributions thereto. [2]

3. In not holding that the owners of certificates that had matured prior to the assignment and had not been paid were creditors of the order, and entitled to be paid before any payment should be made to the members of the order holding certificates that had not matured at said time. [3]

4. In awarding to the owners of matured certificates only 25 per cent of the amount paid in by them. [4]

5. In not awarding to the owners of matured certificates the full amount payable on said certificates, with interest from their maturity. [5]

6. In holding that the words " not exceeding " were put into the certificate and by-laws of the order for the purpose of limiting the obligation of the certificate and the amount to which the member at the time of the maturity of the certificate should be equitably entitled in view of the then condition of the order. [6]

7. In holding that the certificates issued to the matured certificate holders were not absolute undertakings to pay the sum mentioned therein upon the expiration of seven years from their date. [7]

8. In not holding that the only limitation upon the obligation of the order to pay to the owners of matured certificates their full amount is to be found in law I., section 17 of the general laws of the supreme lodge, which provides that " when the amount received for one assessment, less the reserve fund, shall equal an amount less than one thousand dollars, the sum to be paid shall in no case exceed the amount of one assessment less the reserve fund, and the said amount shall be all that can be claimed by any one." [8]

9. In not finding that at the time of the maturity of the certificates presented by exceptants, the amount received for one assessment, less the reserve fund, was $1,000 or over. [9]

10. In holding that the two hundred and ten assessments made on May 3, 1894, were unreasonable and without authority in law. [10]

11. In holding that the whole scheme of the debit assessments made by the order was clearly irregular and illegal. [11]

12. In holding that assessments subsequent to assessment No. 143 paid by members should be repaid such members in full. [12]

13. In not holding that the nonpayment of the assessments made on May 3, 1894, by the unmatured certificate holders of the order, put such members in default, and that they cannot claim any portion of the funds of the order until they relieve themselves of this default by making payment of the said assessments. [13]

14. In not holding that the holders of the unmatured certificates of the order who had not paid the assessments made on May 3, 1894, should be charged with the amount of said assessments as against any sum that they might be entitled to receive as members of the. order. [14]

Exceptions to the auditor's report were dismissed by the court.

*Errors assigned* were (1–14) in dismissing exceptions to auditor's report.

*James Collins Jones, Thomas Ireland Elliott* and *Lewin W. Barringer* with him, for appellants.—It is doubtless true that insolvency is a breach of all the unmatured contracts, so that all the members holding such contracts are relieved from any obligation to contribute to the payment of any contracts maturing after the insolvency : Dettra v. Kestner, 147 Pa. 566.

It is equally true that insolvency does not discharge the obligation upon the order to pay the full amount due on the matured certificates.   Nor does it discharge the obligation imposed on the unmatured certificate holders by their contracts to permit the relief fund to be appropriated to the payment of the matured certificates as against the unmatured.

By the law of Pennsylvania members of an assessment insurance company may be assessed after its insolvency on their

notes or agreements to pay assessments for losses which happened before : Standard Mut. Live Stock Ins. Co. v. Madara, 2 Pa. Dist. Rep. 600 ; People's Mut. Fire Ins. Co. v. Bergstresser, 1 Pa. Dist. Rep. 771 ; Sterling v. Mercantile Ins. Co., 32 Pa. 75 ; Vanatta v. N. J. Mut. Life Ins., 31 N. J. Eq. 15 ; Com. v. Mass. Mut. Fire Ins., 112 Mass. 116 ; Mayer v. Attorney General, 32 N. J. Eq. 815 ; In re Educational Endowment Assn., 56 Minn. 171 ; Stamm v. Northwestern Ben. Assn., 65 Mich. 317 ; Fraternal Guardians' Assigned Estate, 159 Pa. 594.

*William Findlay Brown, M. Hampton Todd* and *John G. Johnson,* for appellees.—The order being insolvent, both matured and unmatured certificate holders were to be treated as members of an organization who had contributed to its funds, and were entitled to participate in the distribution thereof according to the equitable rule that determines the amount of the interest in the fund in accordance with the amount of contributions thereto : Est. of Nat. Saving L. & B. Assn., 9 W. N. C. 79 ; Christian's App., 102 Pa. 184 ; Callahan's App., 124 Pa. 138 ; Fraternal Guardians' Assigned Est., 159 Pa. 594.

Under the terms of the certificate of membership and the by-laws of the order a member's right to participate in the funds is limited to his equitable proportion thereof, even though his certificate was matured : Fraternal Guardians' Assigned Est., 159 Pa. 594.

PER CURIAM, February 3, 1896 :

In principle, this case is ruled by Christain's Appeal, 102 Pa. 184, and other cases, among which are Callahan's Appeal, 124 Pa. 138, and Fraternal Guardian's Estate, 159 Pa. 594, cited by the learned auditor.

The action of the court below in dismissing appellants' exceptions to the auditor's report is the sole subject of complaint in the several assignments of error respectively. Our examination of the record, with special reference to each of said exceptions, has led us to the conclusion that the court was right in dismissing them and confirming the report. In view of the careful consideration that appears to have been given by the learned auditor to all the material questions in the case, and the

satisfactory disposition that was made of them, it would serve no useful purpose for us to consider the specifications of error in detail. There is nothing in any of them that requires discussion. They are all dismissed.

Decree affirmed and appeal dismissed with costs to be paid by the appellants.